*300 OPINION OF THE COURT
George D. Marlow, J.
Defendant was convicted of manslaughter in the first degree by a jury on November 9, 1994 for the second time. His first judgment of conviction rendered by another Judge of this court was reversed for reasons unrelated to this motion (People v Patterson, 203 AD2d 597). Following the instant guilty verdict, defense counsel moved to set it aside pursuant to CPL 330.30 (1) and (2). The motion was denied on the record, and the court imposed sentence on defendant on February 17, 1995.
Defense counsel contends that juror No. 2 "was colorably an 'unqualified’ or 'unavailable’ juror within the meaning of § 270.35 of the Criminal Procedure Law.” He attempts to find support for this claim in a colloquy the court conducted with the juror on the second day of deliberations, i.e., on November 8, 1994. After the court received a request from juror No. 2 to meet with her, the court did so in the presence of defendant and both lawyers. During the ensuing colloquy, the court and juror No. 2 said:
"the court: Okay. Then I will now let you explain to me whatever it is you wanted to tell me. Okay? I’m not sure — Let me just say this to you before you start.
"After you give your explanation, I have no idea what you are going to say, so you have to understand that. So, after you tell me whatever it is that you wanted to tell me, I will probably ask you to just have a seat outside for a moment so I can discuss it with the lawyers, and then I’ll probably bring you back here to react in whatever way I feel is legally proper. Okay?
"juror number 2: Yes. .
"the court: Okay. Go ahead.
"juror number 2: First of all, Judge Marlow, I want to say thank you for helping me understand because this is my first time. And I have given it lots of thoughts, and I’ve asked God to give me a clear mind a clean heart, to make the right decision on this. I never went through this before.
"I understood Mr. Chase. I understood Mr. Steiman. And I went home and I prayed on it. And I removed anyone from being the defendant. Just a blank person. Never seen it, never will see it again. And I examined myself.
"And now, after you read what we were supposed to do *301 yesterday, at this point, I am very, very confused. Very confused. And it is something that I feel that in making a decision it’s something that I have to live with. And I don’t feel comfortable.
"And I don’t know if it’s possible that I could be excused, or if it’s something that I have to go along with, because everybody else is going along with it, or whatever. But, I, myself, do not feel comfortable.
"And like I said, I removed anybody. I know it’s a terrible situation that someone had to be killed. But, to see it, I cannot see myself — if we had left out of the courtroom yesterday, and went into the jury room, and wrote out on a ballot what we thought, or whatever, I — after examining all the witnesses, last week, and the week before last, that I could have done with no problem.
"But right now, I am very, very, very confused. And rather than render a decision, I would rather be excused, if it’s possible.”
The court thereafter denied defense counsel’s request to excuse the juror and to declare a mistrial; and his alternative request to ask her questions about whether she was "totally without the ability to make a decision in this case.” Instead, over defense counsel’s objection, the court gave a supplemental, modified Allen charge (People v Allen, 163 AD2d 396) to the entire jury as follows:
"the court: Okay. Just so that the other jurors are aware of what’s happened, I just want you to know that I spoke to Juror Number 2, and permitted her to explain how she felt to me, in the presence of the lawyers, the defendant, the court reporter, the defendant, the attorneys.
"I’m now going to give the entire jury, all twelve of you, a further instruction. Following which I will ask you to go back into the jury room to resume your deliberations. And if you have, anyone of you, or all of you, or some of you, have any other questions, or request any further instructions on the law, if there’s something about the legal instructions that I gave you yesterday that is confusing to you, to any one of you, or to some of you, or to all of you, I will be perfectly happy to reread the entire charge to you, if that is what you want.
"Even if only one person would want that, I would be willing to do it, because it’s my job, to make sure that all twelve of you understand the legal principles that are involved. And I want every one of you to be assured of the fact *302 that, if you are confused about anything, that you have a perfect right to ask to have any part, or all of the instructions reread for you.
"And, as you all know, I’m sure, you are aware that the purpose of a trial is a search for the truth. And, therefore, it is your obligation, under your oath that you took, to try your best to reach a fair and just verdict, one way or the other. I’m not suggesting that you should agree on a verdict that you do not consider to be a just verdict. But I am suggesting that you attempt to resolve your differences and agree on a verdict that is in accordance with your findings of fact and the law as I have explained it to you.
"And I’ll remind you again, if any one of you wants any further explanations about the law, I will be only too happy to oblige you. Remember that, when you were selected as jurors, you took a solemn oath, that you would decide this case based on the evidence, or the lack of evidence. You swore that you would apply the law to the facts, even though you may not like the law, or even though you may disagree with it. You swore that you would be completely objective in arriving at your final determination. That is what you all swore to do.
"You swore that you would put aside all passion, all prejudice, all bias, all questions of punishment, in arriving at your final determination on the indictment. You swore that if you had a reasonable position, and I repeat, a reasonable position, on any relevant point, or material element, based on the evidence or lack of evidence, and one or more of your fellow jurors questions you about it, that you would at least attempt to give some explanation concerning your position.
"Now, that doesn’t mean that you have to articulate your position in the jury room. But you should seriously consider doing that if your views are different from your fellow jurors. And, you should consider doing that, whether your views are for conviction, or for acquittal.
"And finally, you swore that no matter what your opinion was, with respect to the charge, on your final determination, if you found some evidence that could convince you that you were wrong in your point of view, that you would not hesitate to consider changing your point of view, if you were able to find some evidentiary basis for doing so, after hearing out your fellow jurors.
"Now, I ask you to go back into the jury room and once again review the evidence. Go over the testimony of each *303 witness, sensibly, and weigh it very carefully. Discuss it calmly and dispassionately, listen to the views and arguments of your fellow jurors. This is what I mean by deliberations.
"Now, I just want to add one other thing. I know for all of you, all twelve of you, I’m sure this is not easy. Being a juror is a difficult obligation to fulfill for everyone. And I’m not making light of it, nor is anybody in this courtroom making light of it. I’m only asking you to try your best.
"Please do not close your ears and do not shut your minds. Do not shut out the views and arguments of your fellow jurors. It may be that your fellow jurors may recall some portion of the evidence which you overlooked, inadvertently. This may or may not affect your decision in this case. Reason, look, discuss the law, and then apply the law as I’ve explained it to you.
"I ask you, as good citizens, to be mindful of the oath that you took as jurors. Being under oath you must continue your deliberations, for you are under oath to deliberate in this Court until there are no further deliberations warranted in this case. This does not mean a verdict must be reached. But it does mean that every effort should be made by you, consistent with your conclusions, to arrive at a verdict.
"Consequently, I’m going to ask you to go back and see whether you can come to such an agreement. And I ask you to return, for that purpose, to the jury room. If I can, however, be of any help to you, please do not hesitate to send whatever requests you may wish concerning the trial, the evidence, or my instructions.
"And I want to emphasize something that is very important. It is the bottom line in all of this. And that is, that under no circumstances may any of you compromise a conscientiously held individual position in order to arrive at a unanimous verdict.
"I’m giving you this instruction because it is the law.
"Thank you.
"Please go back and continue your deliberations.”
Although the foregoing was stated to the jury over Mr. Steiman’s general objection, the modified Allen instruction was tailored somewhat as the result of his requests for emphasis on certain language and for an adjustment or deletion of other language contained in a customary Allen charge. It should, however, be mentioned that in suggesting modifica *304 tians he did not waive any of his primary objection to any supplemental instruction.
Defendant now asks this court to vacate this conviction, or, in the alternative, to order a hearing "to determine the state of mind of Juror Number 2.”
Defendant’s contention that this court should have questioned juror No. 2 further seems initially appealing, but lacks merit. The juror’s explanation to the court was by all objective standards an expression by a sincere and religious person that she was feeling the stress of the process of making an important decision in an unfamiliar area of life. For a court now to hold that her genuine expression is enough to taint this verdict would, at best, be naive.
This court has spoken to hundreds, if not thousands of discharged, excused, potential, and sitting jurors and the kind of compelling emotions she articulated does not amount to evidence of her disability, but rather her comments are common human intimations of her understandable difficulty in bringing herself to a final verdict. Every juror handles their obligations and oath with varying levels of difficulty. There is nothing in her statement from which anyone could reasonably argue she was biased, disabled, or that her commitment to her oath was tainted or placed in jeopardy by some external influence or in any other way.
The situation juror No. 2 posed is very different from those presented in various reported decisions. (People v Rodriguez, 71 NY2d 214 [externally created risk of bias]; People v Buford, 69 NY2d 290 [external event and possible personal knowledge of disputed facts created risks of bias]; People v Allen, 163 AD2d 396, supra [mere request to be excused insufficient to warrant discharge of juror]; People v Ballard, 149 AD2d 926 [newly disclosed employment relationship between juror and defendant’s sister creates risk of bias]; People v Ivery, 96 AD2d 712 [court acted hastily in discharging a sworn juror despite the fact the juror agreed to follow the law after making clear statements he might not].)
Nor do the facts herein resemble those in People v Anderson (70 NY2d 729). There, a juror’s statement clearly required the Judge to probe further because the risk of bias on the part of juror No. 7, based on the views he expressed directly to the Trial Judge, was clear and somewhat compelling in the absence of the Judge’s "tactful and probing” inquiry (supra, at 730). Therefore, the Judge in Anderson, before deciding to *305 discharge juror No. 7, should have undertaken a further inquiry.
Finally, defendant’s reliance on People v Williams (181 AD2d 845) is misplaced because there the sworn juror clearly said she could not be fair and impartial regardless of the Court’s charge on the law; and on People v Vinson (143 AD2d 702) because there the Court jumped to a completely unwarranted conclusion based on the facts the court had before it concerning the inappropriate conduct of one of the jurors.
The most negative conclusion one can draw from the statement of juror No. 2 herein is that she was "confused” and not "comfortable” about the decision she knew a jury had to make.
It was also obvious from the text of her own statement that she simply preferred being excused "rather than render a decision.” There was no hint of misconduct, nor of any improper influence, nor of any bias or disability. This juror merely appeared somewhat reluctant to reach a conclusion, a reluctance more akin to the annoyance or irritation which the Buford Court declared should not be deemed disqualifying (69 NY2d, at 299, supra). The Buford Court stressed that while decisions in other reported cases offer "some guidance, each case must be evaluated on its unique facts to determine whether a particular juror must be disqualified under CPL 270.35.” (Supra.)
While trial courts are required in certain situations to undertake a probing and tactful inquiry, there is no script or particular length of questioning required by any appellate decision. Here, the court’s inquiry consisted of giving the juror an open-ended opportunity to express whatever it was that caused her to feel unsettled. After seeing and hearing her, this court remains completely convinced she expressed nothing which would disqualify her, nor was her impartiality at any apparent risk. Therefore, any further questioning could only have invited her to continue her quest to be relieved of a duty at the heart of jury service which many people — including her —find disagreeable.
Had the court acceded to defense counsel’s request to continue questioning juror No. 2 after hearing her "reasons”, such a judicial reaction would have likely given an unhappy juror an unwarranted escape hatch. Juror No. 2 was simply a woman who felt uncomfortable in an unpleasant and unfamiliar decision-making arena. Indeed, to pursue her comments further would have served no useful, valid, or lawful purpose.
*306 Instead of embarking on a series of needless questions— which would likely have invited juror No. 2 to persist in trying to avoid the customary culmination of jury service, an attempt she based only on her discomfort and unspecified "confusion” — the court chose a course of action specifically centered on the content of the actual statements of juror No. 2. Thus, this court delivered an instruction to the entire jury designed not to single her out, nor to coerce her or the rest of the jurors, but, rather, an instruction which contained multiple invitations to address any confusion she may have felt about the facts or the law. Indeed, that instruction focused repeatedly on her expressed concern of confusion and discomfort, leaving her with a friendly and sensitive atmosphere had she desired further guidance.
That measured judicial reaction is all the situation demanded.
Moreover, had the court asked her, as counsel seems to suggest, about the nature of her discomfort or the issues she found confusing, the other jurors would have been absent for that dialogue, an absence which seems at odds with the legal goal of having a collective decision by 12 people, all of whom have heard everything uttered by witnesses, the Judge, and each other.
For the foregoing reasons, the motion to vacate and set aside the verdict was denied without a hearing on the record on February 17, 1995.